UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ERIC ROMERO-LOBATO,<br><br>Defendant. | Case No. 3:18-cr-00047-LRH-CBC<br><br>ORDER |

Defendant Eric Romero-Lobato has filed a motion seeking to dismiss the indictment against him,[1] which has charged him with one count of illegal reentry by a previously deported alien. (ECF No. 40). The government responded (ECF No. 50), and defendant timely replied (ECF No. 54). For the reasons stated below, the Court will deny defendant's motion to dismiss.

**I. Factual Background and Procedural History**

Defendant, a Mexican national, has been charged by indictment with one count of illegal reentry by a previously deported alien, a violation of 8 U.S.C. §1326(a). (ECF No. 1). The indictment indicates that defendant had previously been deported on November 8, 1996; April 16, 1998; October 19, 1999; and April 15, 2002; making this his fifth alleged unlawful entry into the United States. (*Id*.) Defendant's motion to dismiss centers around the events leading up to the entry of his July 31, 1996 removal order and his November 8, 1996 deportation.

///

---

[1] Defendant has other charges pending at the time of this order in a separate case (Case No. 3:18-cr-00049-LRH-CBC) stemming out of allegations that he was involved in an armed robbery and carjacking.

1

According to the record, defendant unlawfully entered the United States sometime in 1986 when he was approximately seven years old. (ECF No. 40-7 at 2). He first came to the immigration authorities' attention on September 20, 1995, when officers from the Reno Police Department initiated a traffic stop on the vehicle in which he and two other individuals were traveling. (ECF No. 40-6 at 2). At the time, defendant was 15 years old. (*Id.*) After being stopped by the police, defendant and the two other occupants (one of whom was his brother, Jesus) fled the scene but were ultimately apprehended and arrested. (*Id.*) Following his arrest, defendant was charged with one count of being a minor in possession of a firearm and two counts of aiming a firearm at a person, both stemming from an incident that had occurred on August 27, 1995. (*Id.*; ECF No. 40-7 at 2; ECF No. 42 at 4). Various records note that at the time of his arrest, defendant was a known member and possibly the leader of a street gang known as the "Mara Villa Peewees." (*Id.*; ECF No. 42 at 4). Defendant was initially placed into the custody of the Immigration and Naturalization Service ("INS"),[2] but was released into local police custody on September 21, 1995, to face his state charges. (ECF No. 40-6 at 2). INS subsequently lodged an immigration detainer on him. (*Id.*) While in local police custody, defendant was held at Wittenberg Juvenile Hall. (ECF No. 40-7 at 2).

While detained at Wittenberg, defendant was personally served with an "Order to Show Cause and Notice of Hearing" ("OSC") on September 30, 1995. (ECF No. 51-1 at 2). The document, which was in both English and Spanish, informed defendant that the government believed that he was not lawfully present in the United States in violation of Immigration and National Act ("INA") §241(a)(1), and he therefore would be required to appear before an immigration judge. (*Id.* at 3). It also advised defendant of his rights and responsibilities at his master calendar hearing and the potential consequences of not attending. (*Id.* at 3, 5). It listed defendant's permanent address as "611 Spokane St., [unit] #C, Reno, Nevada 89507," and it also told defendant to notify the Office of the Immigration Judge in writing if he had any change of address or telephone number. (*Id.* at 2, 6). The service portion document indicates that it was read

---

[2] INS ceased to function in 2003; most of its law enforcement responsibilities were transferred to Immigration and Customs Enforcement ("ICE").

to defendant in English, but the space where defendant was supposed to place his thumbprint is blank. (*Id.* at 6). Instead of defendant's thumbprint, a note inside the thumbprint box reads that there was "no ink available." (*Id.*) Defendant did not sign under the "certificate of service" section of the document; a note from the serving officer indicated that defendant "[did] not wish to sign" it. (*Id.*).

Defendant was declared a ward of the court on January 26, 1996, and he was placed on juvenile probation the same day. (ECF No. 42 at 4). Although the reason for defendant being declared a ward of the court is not readily apparent, commentary on a 1999 presentence report[3] indicates that in 1996, defendant's family was "non-cooperative and failed to respond to efforts to locate [him] and address his delinquent behavior." (*Id.*) It is not explicitly stated in the record where defendant resided following his release from juvenile hall. It appears that he returned to his mother's apartment at 611 Spokane St., because on February 28, 1996, an "Eric Lovato" signed for the delivery of a copy of his OSC, which is identical to the one that was delivered to him while he was held at Wittenberg. (ECF 51-1 at 2). Approximately a month later on March 27, INS mailed defendant notice that his master calendar hearing would be held on July 31, 1996. (ECF No. 40-14 at 2). This notice was sent to the same 611 Spokane St. address. (*Id.*)

Defendant failed to appear for his July 31, 1996 master calendar hearing. (ECF No. 52-1 at 2). Because defendant failed to appear and argue his case, the immigration judge ordered him removed in absentia to Mexico. (*Id.*) A warrant of deportation was issued on the same day as the master calendar hearing, and it was mailed to defendant's 611 Spokane St. address on September 17, 1996. (ECF No. 52-2 at 3). A delivery receipt indicates that an "Eric Romero" signed for the delivery. (*Id.*) On the same day, an "Order to Report" was mailed to the defendant's 611 Spokane St. residence, informing him that he was required to report to the immigration officer on September 27, 1996, to be deported to Mexico. (ECF No. 40-16 at 2). Defendant did not show up at the scheduled date and time. Instead, he remained at large until November 4, 1996, when he was arrested for possession of stolen property and burglary of a motor vehicle. (ECF No. 42 at 4).

---

[3] The report was prepared in anticipation of defendant's sentencing for conspiracy to commit battery with a deadly weapon.

3

Defendant was returned to Wittenberg Juvenile Hall, where on November 6, INS lodged an immigration detainer against him. (*Id.*; ECF No. 40-17 at 2). Two days later on November 8, defendant was removed to Mexico. (ECF No. 52-3 at 3). Following defendant's deportation, he subsequently illegally reentered the United States three more times in the late 1990s and early 2000s, and he was removed each time. (ECF No. 1). Defendant is currently charged with illegally reentering the United States for a fifth time and seeks to dismiss the indictment against him. (*Id.*)

## II. Legal Standard

8 U.S.C. §1326(d) allows for an alien criminally charged under §1326(a) for illegal reentry to challenge the validity of the predicate removal order, but only if: (1) the alien exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair. To establish that an order of removal is fundamentally unfair, the defendant must show that defects in the proceedings violated his right to due process, and he suffered prejudice as a result of the due process violation. *U.S. v. Aguilera-Rios*, 769 F.3d 626 (9th Cir. 2014). Under current Ninth Circuit precedent, an alien is excused from meeting the first two requirements if he can demonstrate that he was prejudiced by a due process violation (the third requirement). *U.S. v. Ochoa*, 861 F.3d 1010, 1020 (9th Cir. 2017).

## III. Discussion

Defendant's motion to dismiss seeks to collaterally attack his original July 31, 1996 removal order on two separate grounds. First, he argues that his July 31, 1996 deportation order "affirmatively misled him about his statutory right to seek to reopen and rescind the order." (ECF No. 40 at 8). Second, he argues that neither he nor his mother (his adult guardian) were personally served with his OSC, and because service on both alien and guardian is mandated, his due process rights were violated. (*Id.*) The Court will address defendant's service argument first.

///

///

///

4

**A. Service of the Order to Show Cause**

Defendant first argues that his due process rights were violated when neither he nor his mother received notice of his July 31, 1996 master calendar hearing. (ECF No. 40 at 15–16). He argues that under a Ninth Circuit opinion, *Flores-Chavez v. Ashcroft*, 362 F.3d 1150 (9th Cir. 2004), the INS was required to send notice to both him and his mother (his legal guardian at the time).[4] The government responds by arguing that defendant received notice not once but twice, and because he was over 14 years old at the time of the initiation of his removal proceedings, the INS was not required to send his mother notice. (ECF No. 51 at 4, 10).

As an initial matter, the parties disagree as to what law governs the Court's analysis. Defendant argues that the immigration regulations at the time of his offense should apply because the government's proffered regulations were not adopted until 2003, whereas the defendant's proceedings took place in 1996. (ECF No. 54 at 2). On the other hand, the government cites to the modern regulations. (ECF No. 51 at 10). Defendant is correct; Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") in 1996, which made major changes to the Immigration and Nationality Act ("INA") and substantially overhauled the nation's immigration laws. Pursuant to IIRIRA §309(c), aliens who are placed into deportation proceedings before April 1, 1997, and who have a final deportation order entered before October 30, 1996, have their cases governed under the framework prior to the enactment of the IIRIRA. *See Socop-Gonzalez v. I.N.S.*, 272 F.3d 1176, 1183 (9th Cir. 2001) (stating that aliens who are in deportation proceedings before April 1, 1997, and who have their deportation order entered after October 30, 1996, are governed by the transitional rules). Defendant's immigration proceedings began on September 30, 1995, when he was first served with his OSC while in detention at juvenile hall, and his removal order became final on July 31, 1996. (ECF No. 51-1 at 2; 52-1 at 2). Thus, his case is governed by the previous INA framework rather than the new IIRIRA regulations.

The issue of which law governs defendant's case is inconsequential, however, because as defendant states in his reply, the old and new regulations at issue are largely the same, albeit

---

[4] At the time of defendant's removal proceedings, his father was a federal fugitive living in Mexico and wanted by authorities for selling "bogus" green cards. (ECF No. 51-4 at 2).

codified in different places. (ECF No. 54 at 5). 8 C.F.R. §103.5a(c)(2)(ii) was the old notice provision concerning minors, which required that where an alien is less than 14 years old, "service shall be made upon the person with whom [the minor] resides; whenever possible, service shall also be made on the near relative, guardian, committee, or friend." The current notice provision to which the government cites, 8 C.F.R. §1236.2, redirects the reader to §103.8(c)(2(ii), which is identical to the old §103.5a(c)(2)(ii).

Turning to the merits of defendant's argument that he never received service, the old INA notice requirements (as codified in 8 U.S.C. §1252b) required that written notice be given in person to the alien. If not practicable, then notice should have been sent to the alien or his counsel via certified mail. Defendant argues that he was never personally served with the OSC because the two forms of service verification (signature and thumbprint) were blank. (ECF No. 40 at 18). He additionally argues that he was never served via certified mail because "INS misread the residential address" on his student ID card, and even if that address was correct, "[i]t is uncertain whether [defendant] was ever released to the custody of his mother or to another legally responsible adult, or whether he remained in juvenile custody at Wittenberg Hall." (*Id*. at 19).

Defendant's arguments have no merit. First, the record clearly establishes that he was personally served with the OSC on September 30, 1995, while he was detained at Wittenberg Juvenile Hall. (ECF No. 40-11 at 4). While defendant is correct in noting that the OSC did not contain his thumbprint because no ink was available, his signature is missing because he refused to sign the document when it was served on him. (*Id*.) As the government asserts, defendant appears to have a penchant for refusing to sign what he knows to be immigration documents, as evidenced by his refusal to sign other documents following a 1998 illegal reentry. (ECF No. 52-4 at 2, 6). Instead of the defendant's signature, the document is signed and dated by the immigration officer who visited him at Wittenberg. (*Id*.) Defendant cannot now argue that service was deficient for want of a signature when it was he who refused to sign the document in the first place. It is well established that with a collateral attack on the underlying removal order, the defendant has the burden of demonstrating each of the three elements. *U.S. v. Ochoa*, 861 F.3d 1010, 1019 (9th Cir. 2017). Defendant has not provided any evidence that the immigration officer was untruthful

when he signed and dated the OSC or any other evidence casting doubt on its validity other than his own speculation.

But even if defendant was not personally served with the OSC while detained at Wittenberg, the evidence establishes that he received it at the address he shared with his mother by certified mail. As an initial matter, if defendant's address was incorrect on the OSC, then it was his affirmative duty to notify the immigration authorities of his true address. *Hernandez-Castillo v. Sessions*, 875 F.3d 199, 205 (5th Cir. 2017); 8 U.S.C. §1229(a)(1)(F).[5] The OSC also informed defendant of the need to inform immigration officials of any change of address. (ECF No. 51-1 at 6). In any event, the record establishes that an "Eric Lovato,"[6] living at "611 Spokane Street #C, Reno Nevada 89507," signed for the OSC on February 28, 1996. (*Id*. at 2). The signature of "Eric Lovato" is quite similar to the signature of "Eric Romero," who signed for defendant's deportation warrant on September 17, 1996, at the same 611 Spokane St. address. (ECF No. 52-2 at 3). Defendant would have the Court believe that there was *another* Eric Romero-Lobato living two doors down from defendant at the same apartment building in which he resided, *and* who happened to sign for his immigration documents on two separate occasions. To put it lightly, this argument stretches credulity. The fact that defendant signed for his immigration papers not once but twice also dispels the confusion regarding his whereabouts at the time. A cursory glance of the record reveals that on January 26, 1996, defendant was placed on probation for the offenses that originally sent him to Wittenberg. (ECF No. 42 at 4). As the record establishes, he returned to his mother's apartment at 611 Spokane St. Moreover, if defendant had been detained in juvenile hall from August 27, 1995 to November 8, 1996, it would not have been possible for him to be arrested for possession of stolen property and vehicle burglary on November 4, 1996. (*Id*.) The Court is highly skeptical of defendant's professed lack of knowledge of his whereabouts; if anyone knows whether defendant spent over a year incarcerated in juvenile hall, it would be him.

///

///

---

[5] This requirement was the same before and after enactment of the IIRIRA.

[6] One of the documents within the record refers to defendant's name as "Eric Lovato." (ECF No. 51-2 at 2).

7

The Court finds that defendant received the OSC while he was detained at Wittenberg and via mail after he was released on probation. But the issue of whether defendant's mother received notice – or if she was even required to have received it – is far more complicated.

Defendant heavily relies on a Ninth Circuit case, *Flores-Chavez v. Ashcroft*, 362 F.3d 1150 (9th Cir. 2004), for the proposition that for all aliens under the age of 18, notice must be sent to both them and their parent or guardian. (ECF No. 54 at 3–5). In *Flores-Chavez*, the Ninth Circuit noted that the INS regulations did not address whether notice had to be sent to a minor between 14 and 18 years old. *Id*. at 1156. The Ninth Circuit compared the notice regulation (8 C.F.R. §103.5a(c)(2)(ii)) and its requirement that the INS notify an alien's guardian if they are under 14 to a regulation addressing the release of minors from detention (8 C.F.R. 242.24(a)-(b)(1)). *Id*. at 1156. The release regulation stated that "juveniles" in INS custody should be released to either a parent, legal guardian, or other adult relative not currently in INS custody. *Id*. The term "juveniles" was defined as "aliens under the age of eighteen (18) years." *Id*. The Ninth Circuit reasoned that if adults were to be responsible for the appearance of their children or wards in immigration court, they must be formally notified too despite the notification provision only requiring parental notice for aliens under 14. *Id*. at 1162. Both the Fifth and Eighth Circuits would later reject the Ninth Circuit's reasoning in subsequent cases, holding that service to a parent or legal guardian is only required when the alien is under 14. *Lopez-Dubon v. Holder*, 609 F.3d 642 (5th Cir. 2010), *cert denied*, 563 U.S. 960 (2011); *Llapa-Sinchi v. Mukasey*, 520 F.3d 897 (8th Cir. 2008). Defendant argues that the Court is bound to follow *Flores-Chavez*. (ECF No. 54 at 2).

The Court disagrees. *Flores-Chavez* dealt with a situation where the juvenile alien was only provided notice in person while he was in INS custody. *Flores-Chavez v. Ashcroft*, 362 F.3d 1150, 1153–54 (9th Cir. 2004). Here, as the Court determined above, defendant received notice both in person and at the address he shared with his mother. In an unpublished decision, the Ninth Circuit appeared to hold the latter form of service was sufficient to place the minor alien's parent on notice. *Orellana-Gevara v. Holder*, 381 Fed. App'x. 667, 668 (9th Cir. 2010). In *Orellana-Gevara*, the Ninth Circuit held that an immigration judge did not abuse her discretion when she denied an alien's motion to reconsider his removal proceedings that had been conducted in absentia,

8

"because the notice of hearing was addressed to Orellana–Gevara in care of his adult custodian at their shared address of record." *Id*. The Ninth Circuit then cited to *Flores-Chavez*, with a parenthetical explaining that notice not served to a parent of a minor alien was a due process violation. *Id*. In the Court's view, although the opinion is devoid of any factual background, the Ninth Circuit appears to have endorsed the situation before the Court today – that defendant's mother received notice when the OSC was delivered to her apartment via certified mail addressed to defendant.

But the Court is doubtful that *Flores-Chavez* remains controlling law. Following the Ninth Circuit's decision in *Flores-Chavez*, the Board of Immigration Appeals ("BIA") rejected the Ninth Circuit's interpretation of its own regulations and held that notice did not have to be sent to the parent or guardian of an alien between 14 and 18 years old. *Matter of Cubor-Cruz*, 25 I. & N. Dec. 470 (B.I.A. 2011). The BIA adopted the reasoning of the Fifth and Eight circuits, quoting from the Eight Circuit's opinion in *Llapa-Sinichi*:

> The purpose of the notice provision is to let individuals know the details of their legal proceedings. The purpose of the release provision, however, is not to provide knowledge, but to provide assistance to minors in a foreign land, perhaps for the first time. It is therefore logical for the regulations to provide that minors entering the country illegally can be responsible for receiving notice regarding their court proceedings and yet also provide that minors may need assistance from adults to obtain basic necessities.

*Id*. at 473 (quoting *Llapa-Sinchi v. Mukasey*, 520 F.3d 897, 900–01 (8th Cir. 2008). The BIA noted that while the Department of Homeland Security could send notice of a removal hearing to the alien's parents, it was not required to do so under the regulations. *Id*. It thus rejected the respondent's argument under *Flores-Chavez* and denied his petition.

It is well established that agency interpretations of their own regulations are "controlling unless 'plainly erroneous or inconsistent with the regulation.' " *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)). Under the *Auer* standard, a court should defer to the agency's interpretation of its ambiguous regulation unless an "alternative reading is *compelled* by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation." *Marsh v. J. Alexander's LLC*, 905 F.3d 610, 623 (9th Cir. 2018) (quoting *Bassiri v. Xerox Corp.*, 463 F.3d

9

927, 931 (9th Cir. 2006)). Interpretations that "do not reflect the agency's fair and considered judgment of the matter in question" or unfairly surprise the parties are not entitled to *Auer* deference. *Id.* at 623–24 (citing *Christopher v. SmithKline*, 567 U.S. 142, 155–56 (2012)). *Cubor-Cruz* is the BIA's binding interpretation of regulations promulgated by the Department of Justice. *Hernandez-Perez v. Whitaker*, 911 F.3d 305, 312 (6th Cir. 2018) (citing 8 C.F.R. §§ 1003.13–.15; Executive Office for Immigration Review; Rules of Procedures, 57 Fed. Reg. 11,568 (Apr. 6, 1992)). It does not appear that the Ninth Circuit has revisited this somewhat obscure issue since *Flores-Chavez* in 2004. It is thus up to the Court to determine whether to apply *Flores-Chavez* or *Cubor-Cruz*. *See Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 982–83 (2005) ("A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."); *Decker v. Northwest Environmental Defense Center*, 568 U.S. 597, 617 (2013) ("In practice, *Auer* deference is *Chevron* deference applied to regulations rather than statutes.") (Scalia, J., dissenting).

The first step in the Court's analysis is to determine if the INS notice regulation (8 C.F.R. §103.5a(c)(2)(ii)) is ambiguous. If it is, then the Court proceeds under *Auer* to determine if the BIA's interpretation of the regulation was "plainly erroneous or inconsistent with the regulation." *Bassiri v. Xerox Corp.*, 463 F.3d 927, 931 (9th Cir. 2006) (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)). But if the regulation is unambiguous, then the Court is bound to follow the Ninth Circuit in *Flores-Chavez*. The ambiguity issue is easily resolved, however, as the *Flores-Chavez* court itself stated that there was confusion regarding whether notice had to be sent to juvenile aliens between 14 and 18 years old. *Flores-Chavez v. Ashcroft*, 362 F.3d 1150, 1156 (9th Cir. 2004). The Court's task thus becomes whether the BIA's interpretation of the notice regulation was "plainly erroneous" or "inconsistent with the regulation."

It is not. As the BIA noted in its opinion, the purpose of the notice statute is to inform individuals of their legal proceedings, whereas the release provision is designed to aid minors in a foreign land. *Matter of Cubor-Cruz*, 25 I. & N. Dec. 470, 473 (B.I.A. 2011). This is a reasonable

interpretation of the regulations; whereas someone under the age of 18 may have difficulty preparing for and attending the removal proceedings, it is not unreasonable to assume that juveniles over 14 are sufficiently developed to understand what the ramifications of an OSC are. This is especially true in defendant's case when the document was explained to him in person by an immigration officer. Stated differently, as the Eight Circuit wrote, as quoted by the BIA: "It is therefore logical for the regulations to provide that minors entering the country illegally can be responsible for receiving notice regarding their court proceedings and yet also provide that minors may need assistance from adults to obtain basic necessities." *Id*. (quoting *Llapa-Sinchi v. Mukasey*, 520 F.3d 897, 900–01 (8th Cir. 2008)). If regulation drafters at the INS intended for juvenile aliens under the age of 14 to have their parents or guardians receive notice directly, they could have easily specified a different cutoff age. But they specifically chose the age of 14 as the cutoff age, and the Court sees little reason to divert from the BIA's interpretation of its regulations.

Defendant's arguments fail at every step of the Court's analysis. The record establishes that defendant's mother did receive notice of his OSC because a copy of the document was sent by certified mail to the address he shared with his mother. *Orellana-Gevara v. Holder*, 381 Fed. App'x. 667, 668 (9th Cir. 2010). But even so, under binding BIA authority, the INS was not required to serve notice upon defendant's mother. The Court will according deny defendant's motion to dismiss on this ground.

### B. The Validity of Defendant's Removal Order

Next, defendant argues that his removal order was fundamentally unfair because he was "affirmatively misled" about the administrative relief available to him. (ECF No. 40 at 9). To briefly restate the operative law, under 8 U.S.C. §1326(d)(3), an alien can demonstrate this requirement by showing that his due process rights were violated, and he was prejudiced as a result of that violation. *U.S. v. Ochoa*, 861 F.3d 1010, 1020 (9th Cir. 2017). Defendant argues that his due process rights were violated because on September 17, 1996, he received an order to report for deportation that told him that "there is no administrative relief which may be extended to you."

(ECF No. 40 at 9).[7] As to prejudice, he argues that if he had been told of the proper avenues of relief, he would have: (1) petitioned to obtain legal permanent resident status; (2) sought a waiver under INA §212(h); (3) sought Special Immigrant Juvenile Status; or (4) sought voluntary departure. (*Id*. at 11–12).

It is well-established that the government violates an alien's due process rights when it "affirmatively misleads" the alien as to the relief available to him. *U.S. v. Arias-Ordonez*, 597 F.3d 972, 977 (9th Cir. 2010) (citing *Walters v. Reno*, 145 F.3d 1032, 1043 (9th Cir. 1998)). In *Arias-Ordonez*, the Ninth Circuit found that the defendant's order to report was "affirmatively misleading" when it advised him that there was "no administrative relief which may be extended" to him; instead of accepting the order, the defendant could have petitioned the immigration court to rescind his deportation order that had been entered in absentia. *Id*. On first blush, *Arias-Ordonez* appears to be similar to the case before the Court, as the language in both defendant's order to report and the one in *Arias-Ordonez* is nearly identical. Additionally, like the alien in *Arias-Ordonez*, defendant had a statutory right to petition the immigration court to rescind his removal order entered in absentia. But defendant's case has one major factual difference: he was previously advised of his right to seek rescission of any removal order not once but twice. The OSC provided the following information to defendant about the consequences of not showing up for his removal hearing:

> If you are deported in your absence, you cannot seek to have that order rescinded except that: (a) you may file a motion to reopen the hearing within 180 days after the date of the order if you are able to show that your failure to appear was because of exceptional circumstances, or (b) you may file a motion to reopen at any time after the date of the order if you can show that you did not receive written notice of your hearing and you had provided your address and telephone number (or any change of your address or telephone number) as required, or that you were incarcerated and did not appear at your hearing through no fault of your own.

(ECF No. 51-1 at 5). As the Court found above, defendant received his OSC twice, once in person while detained in juvenile hall and once by certified mail following his release. This does not

---

[7] The Court pauses to note a glaring contradiction in defendant's argument. Defendant also argues that he never received the order to report for deportation in the first place because "[t]he letter was sent to a non-existent address." (ECF No.40 at 10). But if this was true, then it would be impossible for defendant to have suffered a due process violation resulting from a document he never knew existed and never saw.

appear to be the case in *Arias-Ordonez*, where there is no evidence to indicate that the defendant was ever informed of this statutory right. *Arias-Ordonez*, 597 F.3d at 975. Defendant cannot now argue that he was "affirmatively misled" about his right to reopen his removal proceedings when he was twice advised of the correct relief.

At best, defendant could argue that his receipt of conflicting information was "confusing," but the Court is doubtful that the circumstances in this case rise to the level of confusion required for a due process violation. In *Walters v. Reno*, the predecessor to *Arias-Ordonez*, the Ninth Circuit held that when the government provides "affirmatively misleading" or "confusing" information to an alien in immigration proceedings, the alien's due process rights are violated. 145 F.3d 1032, 1042–43 (9th Cir. 1998). In *Walters*, a group of aliens sued the INS, arguing that the process by which it served them with information regarding allegations of civil document fraud violated their due process rights. *Id*. at 1038. The Ninth Circuit agreed, particularly because of the confusing nature of the forms that the INS routinely provided those accused of fraud. The court noted how the civil fraud forms, *inter alia*, failed to list the immigration consequences of being found liable of fraud, were written using complex legal language, did not provide a Spanish translation, and did not advise the aliens that they were required to request a hearing on the charge separate from their removal hearing. *Id*. at 1042. The court even noted that the forms were so confusing that "even some of the INS agents who administer them are unable to explain adequately the immigration consequences of a final order on document fraud charges." *Id*. at 1040.

The forms that defendant received in this case do not have the same issues as the forms in *Walters*. The OSC and order to report were both written in plain language, with the former also available in Spanish. (ECF No. 51-1 at 5). The OSC correctly stated what would happen if defendant failed to appear for his hearing and how he could remedy a failure to appear, and it was even explained to the defendant in person by the serving officer. (*Id*.) Defendant only points to the fact that the order to appear incorrectly informed him that "there is no administrative relief which may be extended to [him]" as evidence of confusion (while simultaneously arguing that he never received the form), but this one statement cannot be fairly compared to the forms in *Walters*. There,

unlike here, the aliens were never informed of the operative law or the consequences of admitting liability. Defendant, on the other hand, was informed not once but twice of the consequences.

But even assuming that defendant's due process rights were violated by the order to report, he still must demonstrate that he suffered prejudice as a result of the misinformation. Although an alien does not need to show that he would have actually been granted immigration relief, he must demonstrate that such relief was "plausible." *U.S. v. Ubaldo-Figueroa*, 364 F.3d 1042, 1050 (9th Cir. 2004); *U.S. v. Arrieta*, 224 F.3d 1076, 1079 (9th Cir. 2000). Defendant argues that he was eligible for the four avenues of relief stated above, but he overlooks the fact that before he could petition the immigration court for any substantive relief, he was first required to have his absentia removal order rescinded. Under the current statutory framework, which was the same at the time of defendant's removal proceedings,[8] an alien ordered removed in absentia may only seek to have the order rescinded if he files a motion within 180 days after entry of the order and demonstrates that the failure to appear was because of exceptional circumstances. 8 U.S.C. §1229a(b)(5)(C)(i) (previously codified at 8 U.S.C. §1252b(c)(3)(A), *see Romani v. I.N.S.*, 146 F.3d 737, 738 (9th Cir. 1998)). As defined within the statute, an "exceptional circumstance" refers to a circumstance "such as battery or extreme cruelty to the alien or any child or parent of the alien, seriousness illness of the alien, or serious illness or death of the spouse, child, or parent of the alien," that is beyond the alien's control. 8 U.S.C. §1229a(e)(1); *Romani*, 146 F.3d at 739. Alternatively, an alien can seek to rescind the absentia order if he can demonstrate that he did not receive notice of the hearing or that he was in federal or state custody at the time of the hearing. 8 U.S.C. §1229a(b)(5)(C)(ii).

Defendant fails to address this issue in his briefing, which under Local Criminal Rule 47-3, constitutes consent to denial of the argument. But nevertheless, a review of the record does not reveal the presence of any "exceptional circumstances." There is no evidence to indicate that defendant or his mother were seriously ill or injured on the date of his removal hearing (July 31, 1996), nor is there any evidence to indicate that they were victims of battery or extreme cruelty. The record is silent on why defendant did not show up for his removal hearing, and he does not

---

[8] *See* ECF No. 51-1 at 5.

provide any explanation for his absence in his brief. Furthermore, as the Court held in the previous section of this opinion, the record firmly establishes that defendant received notice of his removal hearing and that he was not in police custody at the time of his removal hearing. Defendant has failed to establish that it would have been plausible for the immigration court to rescind his removal order, and therefore he was not prejudiced by the misinformation in the order to report. Because defendant cannot show that he would have been eligible to reopen his removal hearing, the Court declines to address whether he would have been eligible for substantive relief. The Court will accordingly deny his motion to dismiss on this ground.

### IV. Conclusion

IT IS THEREFORE ORDERED that defendant's motion to dismiss (ECF No. 40) is **DENIED**.

IT IS SO ORDERED.

DATED this 1st day of April, 2019.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE